## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **Sockeye Licensing TX LLC,** | Case No. 6:22-cv-161 |
| Plaintiff, | Patent Case |
| v. | Jury Trial Demanded |
| **ViewSonic China, Ltd.,** | |
| Defendant. | |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Sockeye Licensing TX LLC ("Sockeye"), through its attorney, Isaac Rabicoff, complains against Defendant ViewSonic China, Ltd. ("ViewSonic" or "Defendant") and alleges the following:

### PARTIES

1.      Plaintiff Sockeye Licensing TX LLC is a limited liability company organized and existing under the laws of Texas with its principal place of business at 320 Wilmette Avenue, Glenview, IL 60025.

2.      Defendant ViewSonic is a corporation organized and existing under the laws of China that maintains a principal place of business at 9F, No.950 Dalian Road, Yangpu District, Shanghai PRC200092 China.

### JURISDICTION

3.      This is an action for Patent infringement arising under the Patent laws of the United States, Title 35 of the United States Code.

1

4.    This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

5.    This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in the Western District of Texas.  Specifically, Defendant provides its full range of products to residents in this District.  As described below, Defendant has committed acts of Patent infringement giving rise to this action within this District.

## VENUE

6.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400. In addition, Defendant has committed acts of patent infringement in this District, and Plaintiff has suffered harm in this district.

## PATENTS-IN-SUIT

7.    Sockeye is the assignee of all right, title, and interest in United States Patent No. 9,547,981 (the "'981 Patent"), including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '981 Patent. Accordingly, Sockeye possesses the exclusive right and standing to prosecute the present action for infringement of the '981 Patent by Defendant.

8.    Sockeye is the assignee of all right, title, and interest in United States Patent No. 8,135,342 (the "'342 Patent"), including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '342 Patent. Accordingly, Sockeye possesses the exclusive right and standing to prosecute the present action for infringement of the '342 Patent by Defendant.

9.      On January 17, 2017, the United States Patent and Trademark Office issued the '981 Patent.  The '981 Patent is titled "System, Method and Apparatus for Using a Wireless Device to Control Other Devices."  The application leading to the '981 Patent was filed on November 3, 2014, which is a continuation of U.S. Application No. 13/418,829; which was filed on March 13, 2012; which is a divisional application of U.S. Application No. 11/898,912, now the '342 Patent, which was filed on September 17, 2007; which claims priority from provisional application number 60/844,645, which was filed on September 15, 2006.  A true and correct copy of the '981 Patent is attached hereto as Exhibit A and incorporated herein by reference.  A true and correct copy of the parent Patent, the '342 Patent, is attached hereto as Exhibit B and incorporated herein by reference.

10.      Prior to the filing of the applications that matured into the '981 Patent and its parent '342 Patent in 2006, state of the art cell phone designs emphasized their use as standalone devices.  In the industry it was widely expected that, as the multimedia capabilities of the cell phone became richer, the cell phone itself would serve as a multimedia player and alternative to traditional modes of viewing video, such as via television screens.  Accordingly, cell phone manufacturers at the time of filing focused on developing the "onboard" capabilities of their products, rather than adapting them to connect with and control a higher resolution device.  Thus, for example, the Nokia N92 mobile device announced in 2005 was marketed as a phone for watching TV.  The Nokia N92, while capable of playing "mobile TV," was designed as an alternate platform for watching television, and it operated as a standalone device, wholly-independent of television sets of the period. The '342 and '981 Patents went further.  In contrast to the standalone approach of the Nokia N92, the '342 and '981 Patents taught particular systems and methods by which the cell phone could connect with and control a higher resolution display

3

device, streaming video thereto.  The state-of-the-art cell phones of the day were not equipped to operate in this way, nor was this their goal.  Indeed, as Nokia stated at the time, the "Nokia N92 offers easy access to TV programs *without* having to sit in front of a television set."  Exhibit C.  Notably, so-called "[t]hird generation mobile phones" or "3G mobiles" which were capable of "multi-media communication" of this kind—i.e., "viewing TV on a mobile phone"—were far from the norm in 2006.  Exhibit D.  As NEC stated at the time, although such devices were "expected to be extremely popular," using a cell phone to view television was itself a "groundbreaking way to use mobile phones." *Id*.  Still more groundbreaking was the inventive approach of the '342 and '981 Patents, which went beyond the cell phones merely equipped to play television, such as the Nokia N92 and the NEC e636, and taught particular systems and methods by which the cell phone could connect with and control a higher resolution display device for streaming video.  The claimed inventions would have been inoperable on even the most sophisticated cell phones of the period, such as the Nokia N92 and NEC e636, because they required significant technical advancements and improvements to the hardware and software "stack" of the cell phone in order to enable their inventive functionality.  *See* Exhibit E.

**Background of the Patented Technology**

11.     The '342 and '981 Patents taught the hardware and software "stack" necessary to implement the particular methods claimed in the Patents.  For example, Figure 3D illustrates the relationships between the hardware and software components of the cell phone itself, as well as the internet and a high-resolution display device, in terms of their hierarchy and I/O requirements and functions. Figure 3D teaches a cell phone operating system that supports TCP/IP services, a desktop browser and operating system within the cell phone, and the device drivers necessary to manage streaming media as it is received from the network, rendered by the operating system,

and communicated to external devices.  Figure 3D teaches that the cell phone's device drivers interact with the peripheral communications hardware and software that, in turn, communicates with external display devices.  Further, Figure 3B shows that the peripheral communications hardware and software interacts with multichannel USB, and IEEE 1394 and IEEE 802.11 protocols that, in turn, use a multiport wireless interface to communicate with a high-resolution digital display device.  Without the hardware and software stack (or its equivalents) disclosed, *inter alia*, in Figures 3B and 3D of the '342 and '981 Patents, the claimed inventions would have been inoperable.  The hardware and software stack disclosed in the Patents was absent from the more advanced cell phones of the day (e.g., the Nokia N92 and NEC e636), which were designed as mere standalone devices—a completely different paradigm than that disclosed in the '342 and '981 Patents, which teach the cell phone connecting with and controlling a higher resolution display device on which media may be streamed.

12.     In the few prior art examples where a cell phone was actually connected to another device, the cell phone was used in a manner completely different than that claimed in the '342 and '981 Patents, and for different purposes.  As the inventor pointed out during prosecution of the parent '342 Patent, the prior art merely "describe[d] a conventional tethering operation of a cell phone to a computer, and not peripheral cell phone control of the claimed invention."  Exhibit F [Prosecution History of '342 Parent Patent, Amendment, May 31, 2011, at 11].  According to the "conventional tethering operation[s]" of the prior art, the "PC or laptop connects to the internet via another PC's or a cell phone's wireless Internet connection, providing a bridge connection but not ceding control."  *Id*.  By contrast, the "instant invention," the inventor explained, "does not use a cell phone to connect a 'computer' to the Internet" — "[q]uite the reverse, the instant invention connects peripheral devices (connected to the

computer) to the cell phone to create a desktop computing environment on the cell phone." *Id*. As the inventor described it in a later amendment during prosecution of the '342 parent Patent, the "present invention" was one "directed to an innovative approach to employ a cell phone or like PDA . . . to create a media center controlled by the user through the cell phone–without the usage of the computing power of the peripherals' PC."  Exhibit G.  [Prosecution History of '342 Patent, Amendment, January 17, 2012, at 31].  The inventor emphasized that in the prior art "the portable device is a mere tether" and "has zero control – the network server is running things directly" in the "traditional client/server relationship." *Id*. at 32.  By contrast, the parent '342 Patent "expressly involves and claims control of the peripheral device by the portable device, not at network control."  *Id*.  Thus, at best, the prior art contemplated the "conventional tethering" of the cell phone to the computer for the purpose of improving the functionality of the computer according to the "traditional client/server relationship."  The '342 and '981 Patents, however— which share a specification—claim and teach improvements in the cell phone hardware and software "stack," enabling it to control the high-resolution display device, in a clear reversal of the "traditional client/server relationship" and departure from "conventional tethering." As the inventor stated during prosecution of the '981 Patent, quoting the summary of the invention, "'[t]he user may access' the movies and videos 'using the desktop monitor' because, for example the 'user interfaces' of the web site providing this content 'can be displayed through' the 'desktop monitor' " and "[t]hose 'user interfaces are sent to the 'desktop monitor' by means of the 'wireless cell phone.' "  Exhibit H [Prosecution History of '981 Patent, Sept. 7, 2016, Declaration of Michael D. Harold, at pages 3-4, para. 7(a)(4)].  None of the prior art discloses the hardware and software "stack" necessary to execute this inventive and unconventional functionality or to accomplish the objectives of the '342 and '981 Patents.

13.     As the inventor pointed out during prosecution of the '981 Patent, the methods

employed in the prior art failed to disclose, for example, the claimed step of "transmitting by the

mobile communications device of at least some of the particular movie or video to the display

device for display thereon **simultaneously** while at least some of the particular movie or video is

being downloaded from the server to the mobile communications device."  Exhibit I [Prosecution

History of '981 Patent, Sept. 9, 2016 Amendment, at 8] (emphasis added).  This unconventional

step of claim 1 of the '981 Patent not only distinguishes it from prior art methods but constitutes

one of the '981 Patent's "inventive concepts," both in its own right as well as in combination

with other claim elements, rendering the Patent eligible under 35 U.S.C. § 101.  Indeed, the

inventor pointed out that this step "teaches away" from the prior art, which merely "discloses

that a document must be fully downloaded before it can be accessed," from prior art wherein

"content is fully downloaded *before* the mobile device 'detects' the display" or from prior art

wherein "a video conference is received or initiated *before* it is routed to the external display."

(Emphasis added).  As such, the inventor noted, the prior art "teach[es] away from the claimed

methods*." Id*. at 8-9.

14.     With respect to the '342 Patent, the element of Claim 21 reciting "wherein said

peripheral device, controlled by said user from said wireless device," expressly "claims control

of the peripheral device by the portable device, not at network control."  Exhibit G, at 32.  This

unconventional element of Claim 21 of the '342 Patent not only distinguishes the invention from

prior art systems but constitutes one of the '342 Patent's "inventive concepts," both in its own

right as well as in combination with other claim elements, rendering the Patent eligible under 35

U.S.C. § 101.  Whereas the prior art taught "conventional tethering" of the cell phone to the

computer for the purpose of improving the functionality of the computer according to the

"traditional client/server relationship," Claim 21 of the '342 Patent claims control by the portable device over the peripheral device, in a clear reversal of the "traditional client/server relationship" and departure from "conventional tethering."  Exhibit G at 32; Exhibit F at 11.

15.     As the inventor further noted during prosecution of the '981 Patent, the "claims are specifically limited to the field of consumer electronic entertainment, as contemplated by the specification."  For example, claim 1 of the '981 Patent specifically limits the "electrical coupling" between the display device and the mobile communications device to be "for consumer electronic entertainment purposes," which puts "limitations . . . on the type of electrical couplings that are covered by the claims*." Id.* at 10-11.

16.     The USPTO issued the '981 Patent on January 17, 2017, without ever having rejected any of the claims under 35 U.S.C. § 101 during prosecution.

17.     The inventor of the '342 and '981 Patents conceived of the inventions disclosed and claimed therein and worked to commercialize them for several years.  Among his goals (and later those of his company, Zamboola) was to provide hardware and software solutions for the mobile market to allow the interfacing of user information between devices in an enhanced way. Accordingly, after filing in 2006 the applications that eventually issued as the '981 Patent and its parent '342 Patent, he set to work prototyping solutions that reduced the claimed inventions to practice.  Mr. Harold began by modifying an "open source" cell phone released after filing, the Openmoko "Neo," which had an operating system and some of the hardware necessary to support streaming media from the Internet to a high-resolution display device.  However, because the software on the Neo proved to be too unstable for the purposes of the claimed inventions, the inventor was forced to migrate to an "Android" operating system.  Still more modifications were necessary after migrating to the Android OS, which was not designed for the

8

purpose of streaming media to a high-resolution display device, and lacked the architecture for concurrent, multi-threaded operations and inter-process communications.  Subsequently, the inventor adapted open-source device drivers to these purposes.  Additionally, because the Neo had a USB port, the inventor developed a USB-to-VGA connector that allowed the cell phone to display media at the higher resolution VGA, controlled by the user via the Neo touchscreen. Thus, the conventional software and hardware components available required significant modifications from their original form before it was possible to integrate them into a prototype incorporating the claimed inventions.

18.    The '342 and '981 Patents are valid and enforceable.

19.    The '342 and '981 Patents describe a need to provide an improved paradigm for using a wireless cell phone or other such communications device as a central component of a desktop or other such computing environment.  Ex. A, 2:61-64.

20.    The '342 and '981 Patents describe a system, method and apparatus in which the user of a wireless cell phone device establishes a direct connection with a desktop computer monitor, keyboard, mouse or other component using any combination of wireline connections and wireless connections.  *Id.* at 1:30-36.

21.    The '342 and '981 Patents are not directed to a method of organizing human activity or to a fundamental economic practice long prevalent in commerce.  The '342 and '981 Patents describe a system that addresses a technical problem—using a wireless cell phone as a central component of a desktop or other computing environment that includes, in addition to a desktop computer monitor and a desktop keyboard and mouse, using the use of desktop speakers and a desktop printer. *Id.* at 3:7-12—with a technical solution: increasing the use of a cell phone

9

as a connection, communications and controlling device for desktop computers, digital display

monitor and keyboard and mouse. *Id.* at 3:41-48.

22.     The '342 and '981 Patents do not preempt the field or preclude the use of other

wireless cell phones.  For example, many companies offer currently offer rudimentary products

that allow a cell phone to project images, presentations and movies onto a nearby wall or surface.

*Id.* at 2:9-12.  The prior art also only uses cell phones as computing devices and not as a full-

sized computer monitor or other full-size digital output device for manipulating data or issuing

commands remotely through the handheld communications devices. *Id.* at 3:20-27.

23.     The '342 and '981 Patents do not take a well-known or established business

method or process and apply it to a general-purpose computer.  Instead, in an exemplary

embodiment, they describe a wireless cell phone as a central component of a desktop or other

computing environment that includes, in addition to a desktop computer monitor and a desktop

keyboard and mouse, the use of desktop speakers and a desktop printer. *Id.* at 3:7-12.  The

desktop computer monitors or other full-size digital display device is also used as a visual output

device, and a full-size keyboard and mouse are used as user input devices. *Id*. 2:66-3:1.

24.     The PTAB declined to institute an IPR against the asserted claim 21 of the '342

Patent in IPR2016-00989, and therefore determined that there was not a reasonable likelihood of

unpatentability on the given grounds.  *See RPX Corp. v. Sockeye Licensing TX, LLC*, IPR2016-

00989 (P.T.A.B. 2016) (declining to institute an IPR as to claims 21, 22, 25 and 26). In IPR2016-

01052, the Petitioner did not seek to institute an IPR of claim 21.  *See RPX Corp. v. Sockeye

Licensing TX, LLC*, IPR2016-01052 (P.T.A.B. 2016) (requesting an IPR for claims 11-19 and

58-76 and denying institution of an IPR for claims 60-61 and 69). In the application leading to

the '981 Patent, the Examiner expressly considered all of the IPR petitions filed against the '342

Patent referred to *supra*, and allowed the '981 Patent to issue over all the prior art cited in those IPR petitions.

**FIRST CAUSE OF ACTION**
**INDIRECT INFRINGEMENT OF THE '981 PATENT**

25.    Sockeye incorporates the above paragraphs herein by reference.

26.    Upon information and belief, Defendant manufactures outside the United States various products (*e.g.*, wireless projectors).  Defendant's products are offered for sale in the USA through the website of its USA affiliate Viewsonics Corporation: https://www.viewsonic.com/us/.

27.    The following is a link to one of Defendant's products: https://www.viewsonic.com/us/products/shop/projectors/home-theater-projectors/x1000-4k.html.  This product includes a projector with a lens, and includes] casting circuity as a component that is provided with it.  This projector, as well as all products that are constructed or operate in a substantially similar way from a patent infringement perspective, are collectively referenced hereinafter as the "Projector Infringing Products."

28.    When used by an end user customer of Defendant, the Projector Infringing Products allow, for example, a YouTube video to be selected and then downloaded from a YouTube server to a user's smartphone, and then wirelessly cast from the smartphone to the casting circuitry of each Projector Infringing Product, which allows the video to be displayed on a surface at which the lens of each Projector Infringing Product is pointed.  When the Projector Infringing Products are used as in this manner, that use involves the performance of all of the steps recited in at least claims 1, 5 and 15-16 of the '981 Patent as, for example, discussed in greater detail hereinafter:

11

a.     The preamble of claim 1 recites a "method for downloading and viewing a movie or video display device."  While it is not a positively recited limitation, corresponding to the preamble of claim 1, each Projector Infringing Product includes casting circuitry that provides a screen mirroring or casting functionality.  This allows a user to cause, e.g., a YouTube video to be downloaded from a YouTube server to the user's smartphone, and then wirelessly cast from the smartphone to the casting circuitry for display on a surface at which the lens of each Projector Infringing Product is pointed.

b.     Claim 1 recites "electrically coupling for consumer electronic entertainment purposes a display device suitable for use in a media center environment with a mobile communications device that does not form a part of the media center environment."  Corresponding to this limitation of claim 1, at least a portion of the lens of each Projector Infringing Product and the surface at which an image from the lens is displayed forms a "display device" that is suitable for use in a media center environment where a movie or video can be watched or online games can be played.  The user utilizes a mobile communications device, e.g., a smartphone, that is not a part of that environment.  The user's smartphone is coupled to the casting circuitry of each Projector Infringing Product by means of a wireless network connection.

c.     Claim 1 recites "causing a first graphic user interface to be displayed on the display device that conveys information to a viewer of the display device about videos or videos that are individually downloadable from a server for display on the display device for consumer electronic entertainment purposes."  Corresponding to this limitation of claim 1, when selecting a video, the YouTube GUI is cast from the smartphone to the casting circuitry of each Projector Infringing Product which then causes it to be displayed to the user on the surface at

which the lens of each Projector Infringing Product is pointed.  By viewing the YouTube GUI, the user can select a video to watch on the surface at which the lens is pointed.

        d.     Claim 1 recites "receiving entertainment selection commands by the mobile communications device to allow a particular one of the videos or videos to be selected for downloading from the server based on visual feedback the viewer receives by reading or interacting with the first graphic user interface shown on the display device."  Corresponding to this limitation of claim 1, the user selects a video to watch by entering commands into the smartphone.  The user makes the selection by reading the YouTube GUI that is displayed on the surface at which the lens of each Projector Infringing Product is pointed.

        e.     Claim 1 recites "receiving by the mobile communications device of the particular movie or video that is sent to it from the server based on the viewer's reading or interaction with the first graphic user interface shown on the display device."  Corresponding to this limitation of claim 1, by selecting a particular video to be watched, the user's smartphone indicates to the YouTube servers that the particular video should be sent to user's smartphone. The user makes the selection by reading the YouTube GUI that is displayed on the surface at which the lens of each Projector Infringing Product is pointed.

        f.     Claim 1 recites "transmitting by the mobile communications device of at least some of the particular movie or video to the display device for display thereon simultaneously while at least some of the particular movie or video is being downloaded from the server to the mobile communications device."  Corresponding to this limitation of claim 1, the particular video that the user selected is streamed from the YouTube server to the casting circuitry of each Projector Infringing Product via the user's smartphone or tablet.

g.      Claim 1 recites "wherein the electrical coupling between the mobile communications device and the display device allows the particular movie or video to be sent there between when the mobile communications device is located a distance away from the display device at which a person watches a video at home."  Corresponding to this limitation of claim 1, the wireless connection between the user's smartphone and the casting chip of each Projector Infringing Product is sufficiently strong and robust to allow the user to place the smartphone, for example, between 10-15 feet away from each Projector Infringing Product.

h.      Claim 5 recites the "method of claim 1, wherein the mobile communications device is adapted to communicate with the server via the internet. Corresponding to this limitation of claim 5, the user's smartphone is adapted to communicate with the YouTube server via the internet.

i.      Claim 15 recites the "method of claim 1, wherein the transmitting of the particular movie or video from the mobile communications device to the display device for display thereon occurs substantially simultaneously with the downloading of the particular movie or video from the server to the mobile communications device.  Corresponding to this limitation of claim 15, the particular video that the user selected is streamed from the YouTube server to the casting circuitry of each Projector Infringing Product via the user's smartphone or tablet.

j.      Claim 16 recites the method of claim 1, wherein the causing step includes downloading the first GUI from the server to the mobile communications device.  Corresponding to this limitation of claim 16, the user's smartphone communicates with the YouTube server to allow it to send to the smartphone at least a portion of the first GUI.

29.      At https://www.viewsonic.com/us/products/shop/projectors/portable-projectors/x10-4ke.html, Defendant describes the x10-fke projector as being able to can also

14

stream multimedia content from your mobile devices via WiFi."  At

https://manuals.viewsonic.com/Wireless_Screen_Mirroring, Defendant states that its projectors

such as the x10-fke model include screen mirroring that provides "a 5GHz Wi-Fi connection for

users to mirror the screen on their personal device."  At

https://www.viewsonic.com/us/products/shop/projectors/portable-projectors.html, Defendant

describes its portable projectors as having "WiFi and Bluetooth connectivity" which "allow you

to wirelessly share and stream videos and movies from compatible smartphones, tablets, and

other mobile devices."

    30.    Thus, by promoting the above-mentioned uses of the Projector Infringing

Products in the manner noted in paragraph 29 above, Defendant actively induces its customers to

use the device to perform the steps of all claim elements of at least claims 1, 5 and 15-16 of the

'981 Patent at least for the reasons discussed herein.

    31.    Since at least the date when this complaint was filed, Defendant has had

knowledge of the '981 Patent, as well as knowledge that the above-mentioned uses of the

Projector Infringing Products induce Defendant's customers to infringe least claims 1, 5 and 15-

16 of the '981 Patent.  This infringement by Defendant's customers, which Defendant has

induced, is ongoing and will likely continue during the pendency of this action.

    32.    Sockeye is entitled to recover damages adequate to compensate it for such

infringement by the Projector Infringing Products in an amount no less than a reasonable royalty

under 35 U.S.C. § 284.

## SECOND CAUSE OF ACTION
## INDIRECT INFRINGEMENT OF THE '342 PATENT

    33.    Sockeye incorporates the above paragraphs herein by reference.

34.     When used by an end user customer of Defendant, the Projector Infringing Products allow, for example, a YouTube video to be selected and then downloaded from a YouTube server to a user's smartphone, and then wirelessly cast from the smartphone to the casting circuitry of each Projector Infringing Product, which allows the video to be displayed on a surface at which the lens of each Projector Infringing Product is pointed.  When the Projector Infringing Products are used as in this manner, that use involves the formation of a system that meets all of the elements recited in at least claim 21 of the '342 Patent.  For example:

a.     Claim 21 of the '342 Patent, which depends from independent claim 20, recites the preamble of claim 20 which references a "peripheral device control system, comprising."   While it is not a positively recited limitation, corresponding to the preamble of claim 21, each Projector Infringing Product includes a lens and, when used, a surface to which the lens is pointed.  At least a portion of the lens of each Projector Infringing Product and at least a portion of the surface to which the lens is pointed forms a "peripheral device."

b.     Claim 21 of the '342 Patent recites "a peripheral device."  Corresponding to this limitation, each Projector Infringing Product includes a lens and, when used, a surface to which the lens is pointed.  At least a portion of the lens of each Projector Infringing Product and at least a portion of the surface to which the lens is pointed forms a "peripheral device."

c.     Claim 21 of the '342 Patent recites "an interconnector."  Corresponding to this limitation, each Projector Infringing Product includes casting circuitry that allows videos or videos casted over to it to be shown on the surface at which the lens of each Projector Infringing Product is pointed during use.

d.     Claim 21 of the '342 Patent recites "said interconnector connecting, at the control of a user, a wireless device to said peripheral device, and."   Corresponding to this

limitation, the casting circuitry of each Projector Infringing Product forms an "interconnector." The casting circuitry allows a user to cause a YouTube video to be downloaded from a YouTube server to the user's smartphone, and then wirelessly cast from the smartphone to the casting circuitry for display on the surface at which the lens of each Projector Infringing Product is pointed during use.

e.    Claim 21 of the '342 Patent recites "downloading user information to said peripheral device."  Corresponding to this limitation, the casting circuitry allows a user to cause a YouTube video to be downloaded from a YouTube server to the user's smartphone, and then wirelessly cast from the smartphone to the casting circuitry for display on the surface at which the lens of each Projector Infringing Product is pointed during use.

f.    Claim 21 of the '342 Patent recites said user information being stored on a server in a communications network."  Corresponding to this limitation, the YouTube video, which is to be displayed on the surface at which the lens of each Projector Infringing Product is pointed during use, is stored in memory on servers provided by YouTube and are accessible over the internet.

g.    Claim 21 of the '342 Patent recites "said peripheral device, upon receipt of the downloaded user information, employing said user information at the control of said user." Corresponding to this limitation, each Projector Infringing Product, upon receipt of the YouTube video, displays the YouTube video on the surface at which the lens of each Projector Infringing Product is pointed during use.  The display of the YouTube video thereon is controlled by the user entering commands into the user's smartphone with reference to a GUI cast from the smartphone that is shown on the surface at which the lens of each Projector Infringing Product is pointed during use.

h.      Claim 21 of the '342 Patent recites "wherein said peripheral device, controlled by said user from said wireless device, is part of a separate system, and." Corresponding to this limitation, at least a portion of the lens of each Projector Infringing Product and at least a portion of the surface at which the lens of each Projector Infringing Product is pointed during use forms a "display device" that is suitable for use in a "home media center environment." The smartphone is not a part of that environment which contains items such as amplifiers and pre-amplifiers. The smartphone is coupled to the casting circuitry of each Projector Infringing Product.

i.      Claim 21 of the '342 Patent recites "wherein said downloaded user information employed by said peripheral device creates an environment selected from the group consisting of desktop computing environment, a media center environment, a portable PC computing environment, a tablet computer computing environment and combinations thereof." Corresponding to this limitation, at least a portion of the lens of each Projector Infringing Product and at least a portion of the surface at which the lens is pointed forms a "display device" that is suitable for use in a "home media center environment."

j.      Claim 21 of the '342 Patent recites the "peripheral device control system according to claim 20, further comprising." Corresponding to this limitation, at least a portion of the lens of each Projector Infringing Product and at least a portion of the surface to which the lens is pointed forms a "peripheral device."

k.      Claim 21 of the '342 Patent recites "means for receiving, at said peripheral device, a wireless communication containing said downloaded user information transmitted from said wireless device; and." Corresponding to this limitation, at least a portion of the casting circuitry of each Projector Infringing Product forms at least a portion of the "means for receiving." It allows the YouTube video to be cast from the user's smartphone via a wireless connection to

the casting circuitry for display on the surface at which the lens of each Projector Infringing Product is pointed during use.

l.      Claim 21 of the '342 Patent recites "means for employing, at said peripheral device, said downloaded user information."   Corresponding to this limitation, each Projector Infringing Product includes a lens and circuitry connecting the lens to the casting circuitry that forms at least a portion of the "means for employing."   It allows the YouTube video to be shown on the surface at which the lens of each Projector Infringing Product is pointed during use.

35.     At https://www.viewsonic.com/us/products/shop/projectors/portable-projectors/x10-4ke.html, Defendant describes the x10-fke projector as being able to can also stream multimedia content from your mobile devices via WiFi."   At https://manuals.viewsonic.com/Wireless_Screen_Mirroring, Defendant states that its projectors such as the x10-fke model include screen mirroring that provides "a 5GHz Wi-Fi connection for users to mirror the screen on their personal device."    At https://www.viewsonic.com/us/products/shop/projectors/portable-projectors.html, Defendant describes its portable projectors as having "WiFi and Bluetooth connectivity" which "allow you to wirelessly share and stream videos and movies from compatible smartphones, tablets, and other mobile devices."

36.     Thus, by promoting the above-mentioned uses of the Projector Infringing Products in the manner noted in paragraph 35 above, Defendant actively induces its customers to use the device to form a system that meets all of the elements of at least claim 21 of the '342 Patent for the reasons discussed herein.

37.     Since the filing of the complaint commencing this action, Defendant has had knowledge of the '342 Patent, as well as knowledge that the above-mentioned uses of the

Projector Infringing Products induce Defendant's customers to infringe least claim 21 of the '342 Patent.  This infringement by Defendant's customers, which Defendant has induced, is ongoing and will likely continue during the pendency of this action.

38.     Sockeye is entitled to recover damages adequate to compensate it for such infringement by Projector Infringing Products in an amount no less than a reasonable royalty under 35 U.S.C. § 284.

## JURY DEMAND

39.     Under Rule 38(b) of the Federal Rules of Civil Procedure, Sockeye respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Sockeye asks this Court to enter judgment against Defendant, granting the following relief:

A.     A declaration that Defendant has infringed the Patents-In-Suit;

B.     An award of damages to compensate Sockeye for Defendant's indirect infringement of the Patents-In-Suit;

C.     An award of damages, including trebling of all damages, sufficient to remedy Defendant's infringement of the Patents-In-Suit under 35 U.S.C. § 284;

D.     An accounting of all damages not presented at trial;

E.     A declaration that this case is exceptional, and an award to Sockeye of reasonable attorneys' fees, expenses and costs under 35 U.S.C. § 285;

F.     An award of prejudgment and post-judgment interest; and

G.     Such other relief as this Court or jury may deem proper and just.

Dated: February 16, 2022                    Respectfully submitted,

                                            /s/ Isaac Rabicoff
                                            Isaac Rabicoff
                                            Rabicoff Law LLC
                                            5680 King Centre Dr, Suite 645
                                            Alexandria, VA 22315
                                            7736694590
                                            isaac@rabilaw.com


                                            **Counsel for Plaintiff**
                                            **Sockeye Licensing TX LLC**

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing document was served on all parties

who have appeared in this case on February 16, 2022 via the Court's CM/ECF system.


/s/ Isaac Rabicoff
Isaac Rabicoff